IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KIMBERLY SIMMS                   :         CIVIL ACTION
                                 :
        v.                       :
                                 :
TRIMAC TRANSP. EAST, INC.        :         NO. 08-2694

MEMORANDUM

Dalzell, J.                                      June 8, 2009

        Plaintiff Kimberly Simms sues her former employer,

Trimac Transportation East, Inc. ("Trimac"), for employment

discrimination under Title VII of the Civil Rights Act of 1964

and the Pennsylvania Human Relations Act.[1] Specifically, Simms

asserts claims for retaliation and disparate treatment

discrimination based on sex.

        Trimac has moved for summary judgment, Simms responded

to that motion, and Trimac replied. Trimac contends that Simms

cannot establish a prima facie case for either of her claims and

that it had a legitimate, nondiscriminatory reason for seeking

her resignation -- namely, her improper acceptance of a loan from

an independent contractor with whom she worked. Simms argues that

_____

        [1] Because Pennsylvania courts have interpreted the
Pennsylvania Human Relations Act interchangeably with Title VII,
our analysis is the same under these two statutes. Weston v.
Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001). For ease of
readability, we will refer to Title VII throughout this
Memorandum, but our findings and analysis are the same under both
statutory schemes.

Trimac's reason is pretextual and that it fired her in retaliation for her complaint of sexual harassment by the same independent contractor and discriminated against her by treating her differently from male employees.

For the reasons we discuss in detail below, we will grant Trimac's motion and dismiss Simms's claims.

## I.   Factual Background

Our analysis of Simms's claims is necessarily fact intensive, so we will first canvass the record.

### A.   Introduction to Trimac and Kimberly Simms

Simms began to work for Trimac, a trucking company, in 2000, and had the title of "traffic supervisor" during her seven years there. Kimberly Simms Dep., Pl.'s Ex. A ("Simms Dep.") at 40-41, 43. She worked at the Croydon branch, which is in the Philadelphia area and within Trimac's Eastern Division, or "Trimac Transportation East." See Kimberly Simms Performance Appraisal, Def.'s Ex. 9 ("Performance Appraisal") at 1. At that branch, Trimac employs drivers who are both employees and independent contractors. Chris Gallowitz Dep., Pl's Ex. D ("Gallowitz Dep.") at 43. Independent contractors sign a lease agreement that prohibits them from driving for other companies

during their lease's term with Trimac. Id. at 44. Traffic
supervisors inform the branch manager when the independent
contractors do something wrong, and the branch manager then
addresses the problem. Id. at 45-46. Adnan Javied, who played a
key role in the events leading up to this case, was an
independent contractor driver. See id. at 61.

Notwithstanding that Simms's title of "traffic
supervisor" never changed, her job responsibilities did. At
first, she was a night dispatcher and "would oversee the drivers
coming in to pick up paperwork and going out, contact any drivers
that were late, [and] maintain communication with the drivers to
ensure on time delivery." Simms Dep. at 43. As a traffic
supervisor, Simms told Javied and other drivers where they would
be dispatched, and she does not remember Javied objecting to any
particular route. Id. at 55. Over time, Simms's responsibilities
expanded to include such things as creating the customer service
report, assisting with recruiting and bidding for new business,
driver training and retention, and organizing safety meetings.
Id. at 52-54. Simms "did billing," "handled payroll," and could
change the drivers' assigned routes and schedules on her own
without anyone's approval. Id. at 43, 47-48. Simms assigned

-3-

drivers to specific routes[2] herself when Jim Kinnevy, who Simms
described as the "lead dispatcher,"[3] was out of the office. Id.
at 43-47; Gallowitz Dep. at 62. When Kinnevy was out, Simms also
ensured that drivers completed all of the customers' deliveries
and complied with government requirements regarding how many
hours they could drive and how often they took breaks to rest.
Simms Dep. at 45. She took on Kinnevy's responsibilities for
about two to three weeks each year and also when he "was out on
disability" for several weeks. Id. at 46.

In trying to retain independent contractor drivers --
one of her regular duties -- Simms would "[c]ounsel drivers" and
"assist [them] in finding resolutions to problems and concerns"
(for example, with payroll or complaints about route
assignments). Id. at 54. In August of 2007, Simms personally

---

[2] Drivers typically preferred some routes over others.
For example, drivers generally found "local runs" more desirable
than international routes because local routes paid a flat rate
and clearing customs could be difficult on international routes.
Simms Dep. at 48-50. Local runs were usually assigned to drivers
with seniority, and though Simms does not know if Javied had any
route preferences, he often drove routes to Canada, New York, and
throughout the Northeast. Simms Dep. at 49-51.

[3] Gallowitz said that Kinnevy and Simms had the same
job title of "traffic supervisor." Gallowitz Dep. at 63. Simms
believed that Trimac discriminated against her because she heard
that it paid Kinnevy more than she. Simms Dep. at 81. There is no
evidence of this in the record.

signed Javied's renewed contract with Trimac. See Lease Agreement
Between Adnan Javied and Trimac Transportation East, Inc., Def.'s
Ex. 10 ("Lease Agreement") at 17, 18, 21.

### B.   **Trimac Management**

Simms does not know if Kinnevy was technically her
supervisor, but she identified the four successive Croydon branch
managers as such. Simms Dep. at 51-52. Chuck Gaines was the
branch manager at the time that Simms's employment ended, and
Simms says that she "g[o]t along with" Gaines. Gallowitz Dep. at
6; Performance Appraisal at 1; Simms Dep. at 51-52, 212. Chris
Gallowitz, the region manager who oversaw the Croydon branch and
other locations, has his office at the Croydon branch.[4] Gallowitz
Dep. at 6. Gallowitz works for Bill Marchbank, Vice-President of
Trimac's Eastern Division for the United States, who in turn
reports to Tom Connard, the President of Trimac U.S. See Trimac
Eastern Division Organizational Chart, Pl.'s Ex. E; Bill
Marchbank Dep., Pl.'s Ex. B ("Marchbank Dep.") at 5, 11. Gina
Pomilla started at Trimac as the "U.S. HR Manager" and held that
position at the time of Simms's resignation, but at the time of
her deposition in December of 2008, her title was Director of

---

[4] Simms reported directly to Gallowitz when there was
no branch manager. Simms Dep. at 52.

Human Resources and Retention. Gina Pomilla Dep., Pl.'s Ex. G ("Pomilla Dep.") at 6-7.

## C.   Simms's Employment Record

By all accounts, Simms appeared to be an exemplary employee. On August 30, 2007, Gallowitz sent her a performance appraisal for the prior eight months. Gallowitz Dep. at 52-53. In that evaluation, Gaines, Simms's direct supervisor, wrote that her "involvement in process, recruitment, and utilization have been [in]strumental in the branch's success." Performance Appraisal at 1. He also stated that Simms's "excellent" participation in a recent leadership training "served to springboard her into line for a promotion to branch management." Id. at 6. Gallowitz wrote that Simms "consistently performs at a high level" and "constantly takes the initiat[i]ve and brings solutions to the table." Id. at 1. According to him, Simms was "ready for the next challenging assignment within Trimac" and was a "tremendous asset." Id. at 1.

The evaluation also included ratings of Simms's success with various "key responsibilities" and indicia of "general performance." Id. at 2, 5. She received positive ratings on every point. See id. Simms herself wrote that she wanted "[t]o take

[her] career to the next level in an effort to obtain personal
and professional satisfaction." Id. at 6. When Gallowitz reviewed
the appraisal with Simms, he told her that she was doing a good
job and to "keep it up." Simms Dep. at 210.

### D.   **Trimac's Policies**

During her employment at Trimac, Simms knew that the
company had a Conflict of Interest Policy, but she does not
remember when she first learned about it or exactly what it said.
Simms Dep. at 58. Simms had access to the Employee Handbook,
which contained the Conflict of Interest Policy, through the
company's intranet. She read other parts of that document while
she worked at Trimac, but she read the Conflict of Interest
Policy "in detail" for the first time in September of 2007, after
her employment with Trimac ended. Id. at 55-56, 63. She remembers
that the policy had some bearing on family members working
together, but does not recall whether it said anything about
accepting gifts. Id. at 59.

But Trimac's Conflict of Interest Policy is quite
broad. It provides that "if employees have any influence on
transactions involving purchases, contracts, or leases, it is
imperative that they disclose to their immediate supervisor or a

-7-

member of Trimac's management as soon as possible the existence

of any actual or potential conflict of interest so that

safeguards can be established to protect all parties." Trimac

U.S. Employee Handbook, Pl.'s Ex. I ("Employee Handbook"),

Conflicts of Interest, at § 107 ("Conflict of Interest Policy").[5]

In the handbook, Trimac expresses a preference for using

"progressive discipline" to resolve violations of its policies,

but also "recognizes that there are certain types of employee

problems that are serious enough to justify either a suspension,

or, in extreme situations, termination of employment, without

going through the usual progressive discipline steps." Employee

Handbook at § 711.

Trimac also had a Code of Business Conduct and Ethics,

which became effective on July 1, 2007[6], and was last revised on

_____

[5] The parties both gave us a version of the Employee
Handbook dated April of 2007, which is after Simms took the loan
from Javied. See Def.'s Ex. 8; Pl.'s Ex. I. However, according to
Pomilla's undisputed testimony, Trimac issued the prior version
of the handbook in 2004 and the only changes it made in 2007
related to the President's job title and the name of the company.
Pomilla Dep. at 61. These changes are of no moment to our
analysis.

[6] Trimac did not have a Code of Business Conduct and
Ethics before July 1, 2007. See Email from Wayne Pinkstone to
Andrew Abramson, Pl.'s Ex. P. There is no evidence in the record
that Trimac created this code in connection with the events at
(continued...)

-8-

August 16, 2007. Pomilla Dep. at 71; Code of Business Conduct and
Ethics, Def.'s Ex. 19, at 1 ("Ethics Code"). The company
distributed the Ethics Code to employees in August of 2007 via
email, and also posted it at the branch offices, but Simms says
that she never saw the document and was not aware of it. Pomilla
Dep. at 71; Simms Dep. at 67. The Ethics Code instructed
employees that they "have a duty to avoid financial or other
business relationships that might be adverse to the interests of
Trimac, or have the potential for producing or creating the
appearance of conflicting loyalties or interest, or interfere
with effective job performance." Ethics Code at 2. The document
specified that "[g]ifts and entertainment may only be accepted or
offered by Trimac Personnel in the normal exchanges common to
business relationships" and warned that disciplinary action for
violating the Code could include termination of employment. Id.
at 2, 4.

　　　　While Simms worked at Trimac, she did not think -- and
no one told her -- that it would be "inappropriate" to accept
gifts or loans from independent contractors, as long as the

---

[6] (...continued)
issue in this case. Indeed, because Trimac did not know about the
loan between Javied and Simms (discussed below) until August 30,
2007, there could be no such connection.

drivers did not expect to receive anything in return. Simms Dep.
at 68-69. In a conversation that Simms had with Pomilla during
the internal investigation of these incidents, however, Pomilla
told her that "accepting a loan from a driver could be a conflict
of interest." Id. at 66. Simms now acknowledges that she knows
this was inappropriate "[b]ecause [she is] no longer at Trimac."
Id. at 69.

### E.  Javied's Loan to Simms

Simms met Javied, an independent contractor driver,
when the company hired him in 2004, and they became friends
around August of 2006. Simms Dep. at 21-22; Gallowitz Dep. at 61;
Simms Email to Pomilla, Def.'s Ex. 20, at 1 ("Simms Email to
Pomilla"). They spoke on the phone about work issues and Simms's
career aspirations, as well as personal concerns such as their
families; they "discussed what friends talk about." Simms Dep. at
22. They also sent each other text messages. Id. at 95. Javied
repeatedly left chocolates and cigarettes in Simms's car, which
she regularly left unlocked in the Trimac parking lot. Id.  at
134, 137-38. With other co-workers, Simms and Javied also went to

bars together at least six to eight times,[7] and he came to her house at least once. See id. at 91-92. There were rumors in the Croydon branch that Simms was having an affair with Javied, but Simms never told Javied that she loved him, and they did not have "any kind of physical relationship." Id. at 95-96, 150.

Simms's husband was in a car accident in the fall of 2006, and they later experienced financial difficulties. Id. at 129-30; Simms Email to Pomilla at 1. They fell behind on their mortgage and also had to buy a new car. Simms Dep. at 129. Simms talked to Javied about the situation, and he said that he would help her buy another vehicle. Id. at 131. She initially rebuffed his repeated offers to help because she "didn't think it was appropriate for him to give a married woman money, and [she] didn't want [her] husband to be upset by it." Id. See also Simms Email to Pomilla at 1. Javied wanted to give her a "gift," but when she would not accept it, he told her to take his money as a loan. Simms Dep. at 133.

When Simms found a check for $2,500 in her car at the end of September or beginning of October of 2006, she discussed

---

[7] Trimac does not have a policy against its employees socializing after hours with independent contractor drivers, and Gallowitz did not think that this was improper. Gallowitz Dep. at 47, 75.

it with her husband, and they decided to keep it as a loan.[8] Id.
at 133, 139; Simms Email to Pomilla at 1. Simms knew that it was
from Javied and told him that she would pay him back, but "he
told [her] no, this was a gift and he wanted to do this to help
[her]." Simms Email to Pomilla at 1. See also Simms Dep. at 136.
Simms insisted that she would pay him back and then deposited the
check into her account on October 16, 2006. Simms Dep. at 136,
218. At the time, Simms did not think that there was anything
wrong with accepting the loan from Javied, and she did not tell
anyone at Trimac about it until she spoke with Gaines nearly a
year later in August of 2007. Id. at 139-40.

Javied offered Simms more money in the spring of 2007
when she "complain[ed] about summer camp for [her] kids and the
cost of it," but she did not accept his help. Id. at 141. The
only money that Simms accepted from Javied was the $2,500 check
in the fall of 2006. Id. at 141-42. She never repaid the loan she
received from Javied because she could not afford to do so, but
there is also no evidence that Simms did anything for Javied in

---

[8] Javied claimed that he gave Simms a total of $8,000,
but Simms contends that he only loaned her $2,500. Simms Dep. at
185-86; Gallowitz Notes at 1-2. For purposes of this motion,
viewing the facts in the light most favorable to Simms, we assume
that Javied gave her $2,500.

exchange for the loan. Simms Dep. at 137; Gallowitz Dep. at 65, 67; Marchbank Dep. at 15.

### F.   Javied's Advances

At some point, Javied became interested in a romantic relationship with Simms. After a "safety banquet" or Christmas party in December of 2006, Simms went to a bar with several co-workers, including Javied. Simms Email to Pomilla at 1. Simms had spoken with Javied "multiple" times between finding the check in her car and the night of the party. Simms Dep. at 140. Later that evening, while Simms was waiting outside the bar for a cab to take her home, Javied told her that he was in love with her and that she should leave her husband. Id. at 80, 140; Gallowitz Notes of Investigation, Def.'s Ex. 17 ("Gallowitz Notes")[9] at 2; Simms Email to Pomilla at 1. She "argued with him for[] a few minutes," and he "grabbed [her] arm and started pulling [her] towards his car" to take her home. Simms Email to Pomilla at 1; Simms Dep. at 143. Simms fended Javied off by pushing and perhaps "attempt[ing] to punch him." Simms Dep. at 143-44. She told him

---

[9]   In her deposition, Simms confirmed that portions of the Gallowitz Notes accurately reflect her own memory of the events. Simms Dep. at 184-189. When we refer to the Gallowitz Notes throughout this Memorandum, we only refer to the portions of the notes that Simms did not dispute.

that her family "can take care of [them]selves." Id. at 144. Some
people from the bar physically separated them, and Simms then
went back inside to wait for her taxi. Simms Email to Pomilla at
1; Simms Dep. at 144-45.

After having "quite a bit to drink," Simms called
Javied on the way home from the bar and told him that she "was
very angry and very disappointed in him." Simms Dep. at 145-46.
She informed her husband about the incident, and he "wanted to
kill" Javied. Id. at 147. She also told two co-workers, including
Kinnevy, about that night, and she discussed it "briefly" with
Gaines at some point prior to August 30, 2007. Id. at 149. In
that brief conversation, Simms told Gaines that she and Javied
"had a confrontation and that [they] were friends" but that she
"was not comfortable with that situation that night." Id. at 150.
Simms also told Gaines that she thought "the situation [was]
resolved" and that it would not affect her performance. Id.

For a while after the safety banquet, Simms and Javied
rarely spoke and only talked about business-related issues. Simms
Email to Pomilla at 1. She had a "cordial[]" encounter with him
at a friend's birthday party in March of 2007, and then in June
Javied called Simms several times and said that he missed their
friendship. Simms Dep. at 154-55. When she told him that she

-14-

"could not give him what he needed," he accused her of having
"several guys on [t]he side" and called her "a slut and a whore."
Gallowitz Notes at 3; Simms Email to Pomilla at 3. See also Simms
Dep. at 155. She asked him to stop calling her and sending
messages to her, and Javied did so, but Simms did not report
these conversations to Gaines or Gallowitz. Gallowitz Notes at 3;
Simms Email to Pomilla at 3; Simms Dep. at 155. Toward the end of
July, Javied and Simms had a conversation about a work-related
issue, and "he commented on how nice it was to talk to [her]."
Simms Email to Pomilla at 3. Simms told him about her application
for a position with Trimac in South Carolina, which we discuss
below, and he gave her a "positive" and supportive response.
Simms Dep. at 113. As mentioned above, Simms also signed Javied's
contract on August 14, 2007. See Lease Agreement at 17, 18, 21.

### G.   Javied's Messages on August 30-31, 2007

On August 30, 2007, Simms began to receive threatening
messages from Javied; she believes he sent them because "he did
not want [her] to leave Philadelphia and chose to start
threatening [her] due to a sick obsession." Simms Email to Barry
Urbani, Def.'s Ex. 24 ("Urbani Email") at 1. She first received a

text message from Javied that she believes[10] said, "I hope you
got the job, you had your legs spread all the way to the top."
Simms Dep. at 157; Simms Email to Pomilla at 3. A couple of
minutes later, Simms called Javied and asked him why he sent the
message, and "[h]e started saying that [she] was a slut, [she is]
a whore, [she] was no different than another girl that he knew
[she] wasn't very fond of . . . and that [she] used him." Simms
Dep. at 158. In another text message later that day, Javied
wrote, "[N]ext time I will be the higher bidder." Gallowitz Notes
at 3. See also Simms Email to Pomilla at 3. Simms spoke with her
husband about the messages, and he was "angry" with Simms for
becoming Javied's friend; he told her to "get Chuck [Gaines and
Chris Gallowitz] involved." Simms Dep. at 166. Around 5:00 p.m.
that day, Javied left another voicemail message informing Simms
that she "had until next Friday at nine a.m. to decide what she
owed him and make a payment arrangement. If not, Javied advised
Simms that he was going to tell her husband that she slept with
Javied." Simms Dep. at 163. See also Simms Email to Pomilla at 3.
He also told her that he would "accept other services" as

_____

[10]   Simms deleted the message because it scared her.
Simms Dep. at 157-58. She also said that she was "in fea[r] of
[her] husband seeing it and getting very upset." Simms Email to
Pomilla at 3.

-16-

payment. Simms Dep. at 164. Because of his tone of voice, Simms thought he was referring to sex. Id. at 165. She deleted this voicemail and did not call Javied back. Id. at 164.

### H.   Trimac's Reaction and Investigation

Although Simms talked with co-workers about Javied's behavior before August 30, 2007, she made no sexual harassment report to Trimac before that date. Id. at 77, 81 (stating that she did not "make any complaints to anyone at Trimac regarding what [she] believed to be a harassment directed towards [her]"). But that evening, she called Gaines on the phone and told him about her communications with Javied and the loan, and Gaines said that he would talk to Javied about the situation. Id. at 161-62; Charles Gaines Dep., Pl.'s Ex. J ("Gaines Dep.") at 20; Gaines Written Statement, Def.'s Ex. 16 ("Gaines Statement"). At that point, Simms asked Gaines "not to take the matter to Chris Gallowitz" because she "was afraid [of] how my friendship with Eddie [Javied] would look in Chris' eyes." Simms Dep. at 183; Gaines Statement. Gaines thought that Simms's acceptance of the loan "would jeopardize her continuing employment" and wanted to amicably resolve the situation because he "didn't think that would be fair." Gaines Dep. at 23.

Gaines met with Javied the next morning, and Javied explained that he wanted Simms to make payment arrangements on the loan before she left Croydon for a new job in South Carolina. Gaines Statement. Gaines asked Javied not to contact Simms about work or personal issues, but Javied nonetheless made one more call, as we discuss below. Id. Gaines now believes that this approach "was probably not the best course of action" for resolving the issues between Javied and Simms. Id. at 23.

On August 31, 2007, at 1:08 p.m., Javied left another voicemail for Simms. Simms Email to Pomilla at 3. He told her, "You turned this into office politics by brining [sic] Chuck in, I don't like that. I'm coming after you. I'm going to make sure you do not get this job let alone promotion. This is war and there are no war[n]ing shots fired.'" Id.[11] After hearing this last message, Simms went to Gaines's office and -- altering her

_____

[11] This version of the voicemail message is substantively similar, though worded slightly differently, to the versions in other documents. According to Gallowitz's notes, Javied said, "[Y]ou are now playing office politics, you went to Chuck about our issue. I am telling you -- I am coming after you. I will mess your . . . . It is a war, and there are no warning shots." Gallowitz Notes at 1. See also Simms Dep. at 166-67. Since Javied left this message, Simms has not spoken with him. Simms Dep. at 172.

position from the previous night -- asked him to "get Chris
[Gallowitz] involved." Simms Dep. at 168.

Simms and Gaines went to Gallowitz's office and told
him "what was going on, that Eddie had threatened [her], that he
wanted payment for money that he had given [her], and that [she]
had taken a $2,500.00 loan from him and he wanted payment for
that." Id. at 169. Simms told them that she had offered to pay
Javied for the loan, but he would not accept it. Gallowitz Notes
at 1. Gallowitz called the police, and a police officer came to
the Trimac office, where Simms, Gaines, and Gallowitz gave
statements. Simms Dep. at 170. Gallowitz told the officer that
Simms's "safety was of concern." Id. at 171. Simms then went
home, and she believes that she spoke with Gaines over the Labor
Day weekend. Id. at 172-73.

That afternoon around 4:15 p.m., Gaines and Gallowitz
met with Javied and told him that Trimac would no longer dispatch
him as a driver, and Javied no longer drove for Trimac after
that. Gallowitz Dep. at 67-68. See also Gaines Statement;
Gallowitz Notes at 2. Javied told Gaines and Gallowitz that he
had given Simms more than $8,000 in the past year, but that
"there was no special business condition or dispatch in exchange"
for the loan. Gaines Statement. See also Gallowitz Notes at 2.

-19-

That same day, Gallowitz called his boss Marchbank and told him that "an independent contractor that worked [at Croydon] was making threatening remarks." Marchbank Dep. at 12. Gaines also called Pomilla and told her that "an independent contractor had threatened Ms. Simms and that there was a message," but she did not know what Javied's message said at that point. Pomilla Dep. at 72. Gallowitz began an investigation on August 31, 2007 at Marchbank's direction, and Pomilla took over the effort on September 6 or 7 "because all the interviews had been completed there [at Croydon]" and Trimac wanted to centralize the information-gathering process. Id. at 76. See also Gallowitz Dep. at 14-15, 78; Gallowitz Notes at 2.

Simms came to work on September 4, 2007 (the Tuesday after Labor Day), and Gaines told her that Trimac "was conducting an investigation and that during the investigation she should not be at work" because it was not safe.[12] Simms Dep. at 173, 175. Simms allegedly told Gallowitz and Gaines at that time that the

---

[12] During this period, according to Trimac, Simms "was suspended with pay while [Trimac] conducted [its] investigation because [it] did not want to place her back at the branch until [it] felt satisfied that there was no sense of impending danger." Pomilla Letter to William Cook, Equal Employment Opportunity Commission Philadelphia District Office, Pl.'s Ex. M; Pomilla Dep. at 93-94. This was "not a suspension in a disciplinary manner." Pomilla Dep. at 93.

$2,500 that Javied gave her in September of 2006 was a "gift," that she tried to give the check back to Javied but he would not accept it, and that she and Javied had never discussed repayment. Gallowitz Notes at 2.[13] She also informed them that she "was very concerned" about her safety, especially because Javied knew where she lived. Id. at 3.

On the afternoon of September 5, Simms spoke to Pomilla and asked her "what was going on, what did this investigation mean." Simms Dep. at 176. Pomilla asked Simms to type up a statement and email it to her, which Simms did. Id. at 176-77. During this conversation, Pomilla told her that Trimac was investigating a conflict of interest, which was the loan that Simms took from Javied. Id. at 177. Simms sent her statement to Pomilla from home.[14] Id. at 192. See Simms Email to Pomilla. Even

---

[13] Simms confirmed that Gallowitz's notes from this conversation were accurate. Simms Dep. at 188. But we will nonetheless assume that it was a loan because that is what Simms herself said in her deposition. Gallowitz felt that a gift of this kind would violate Trimac's policy but thought that a loan was a "kind of a gray area" under the policy. Gallowitz Dep. at 26-27.

[14] Simms claims that she sent this email after her conversation with Pomilla on September 5, 2007, but the email was dated September 4, 2007. Compare Simms Dep. at 175-77 with Simms Email to Pomilla at 1. Pomilla believes that they had this conversation on August 31, 2007. Pomilla Dep. at 73-74. The
(continued...)

-21-

after reading Simms's email, in which she reported that Javied called her a "slut" and a "whore" and that she "had her legs spread all the way to the top," Pomilla did not believe that Simms was reporting an incident of sexual harassment.[15] Pomilla Dep. at 80-81 (discussing Simms Email to Pomilla). Pomilla claims that she tried to contact Simms "quite a few times" after that initial conversation, but Simms never again spoke with her. Id. at 77.

Simms then called Gaines from home, where she was working,[16] and he told her that he did not know why the loan was a conflict of interest. Simms Dep. at 178. Simms continued to call Gaines "on a daily basis" to ask him for an update, but she does not remember what he said to her in those conversations. Id. at 178-79.

---

[14] (...continued)
discrepancy about the specific date of this conversation, however, is not material to the issues at hand.

[15] Pomilla also did not believe that Javied confronted Simms at the bar in December of 2006. Pomilla Dep. at 99.

[16] Gallowitz said that Simms was at home with pay, but that she was told not to do any work for the company during this period. Gallowitz Dep. at 12. Simms claims that she was working, and the documents Trimac filed with the EEOC regarding this period claimed that Simms was suspended with pay. Again, this discrepancy is not material to whether Trimac discriminated against Simms.

-22-

On September 6 or 7,[17] Pomilla called Gallowitz and
explained that she "uncovered some discrepancies and a conflict
of interest." Gallowitz Dep. at 18-19. Gallowitz no longer wanted
Simms as an employee because "[t]here were obvious conflicts of
interest." Id. at 37. Pomilla and Gallowitz recommended to
Marchbank that Trimac end Simms's employment, but the group of
decisionmakers also discussed other disciplinary options.
Marchbank Dep. at 13-14. Marchbank, the most senior person
involved in the decision to terminate Simms, said that he
ultimately made that decision[18] after the investigation revealed
that Simms "was receiving money from the person threatening." Id.
at 12-13. Trimac ended Simms's employment "because she [was] in a
position that affects the routing of drivers, thereby affecting
their pay, and she was receiving money from someone." Id. at 14.

## I.   Simms's Termination

On September 7, 2007, Simms got a call from Gaines, who
told her that she should come to work the following Monday for a

---

[17] Pomilla believes that they finalized the decision to
end Simms's employment on the Friday before the September 10
meeting, which was September 7, 2007. See Pomilla Dep. at 83.

[18] Pomilla characterizes the decision as a "joint
decision" that she, Marchbank, Gallowitz and Tom Connard made.
Pomilla Dep. at 83.

meeting. Simms Dep. at 180. On September 10, Simms met with Gaines and Gallowitz, who told her that she "compromised" herself and the company by taking the money from Javied and that they wanted her to resign.[19] Id. at 181-82. Simms did sign a resignation letter, which Gallowitz believes Gaines drafted at Gallowitz's direction. Simms Dep. at 180, 197; Resignation Letter, Def.'s Ex. 23; Gallowitz Resignation Notes, Def.'s Ex. 22; Gallowitz Dep. at 13. During that meeting, Simms also turned in her work cell phone, keys, and identification. Simms Dep. at 195-96. She told them, "I guess I have to pay for a poor choice" and said that she "never should have taken the money from Javied." Id. at 197. She "absolutely wouldn't have" taken the money if she knew that she was going to lose her job as a result. Id. at 195.

---

[19] Gallowitz claims that the investigation was still ongoing as of September 10 and that he told Simms that Trimac's investigation would stop if she resigned, but Simms says that he did not tell her that. Gallowitz Dep. at 9, 14; Gallowitz Resignation Notes, Def.'s Ex. 22; Simms Dep. at 195. Marchbank and Pomilla, on the other hand, thought that the investigation was complete as of that date, but Pomilla still wanted to talk with Simms. Marchbank Dep. at 20; Pomilla Dep. at 109.

Trimac admits that it asked Simms to "resign her employment in lieu of termination" and that this was an adverse employment action for Simms. Def.'s Brief at 5. Throughout this Memorandum, therefore, we will refer to this event interchangeably as a resignation or termination.

-24-

On September 11, 2007, Pomilla asked Simms to call her, but Simms did not because her attorney advised her not to. Id. at 220. The next day, Simms emailed Barry Urbani,[20] the "manager of employee relations out of Canada," because she hoped that he would help her get rehired. Id. at 219. In the email, she told Urbani that she believed that "what happened to [her] was very unjust." Urbani Email at 1. She characterized her decision to accept the money from Javied as a "poor decision" and explained that she thought it was a loan but Javied thought it was a gift. Id. She contended that there was no conflict of interest between her and Javied, especially since she thought that employees in Philadelphia and South Carolina were supervising family members. Id. She wrote, "I understand now, how stupid it was to allow [Javied] to help me and my family, but at the time I never tho[ught it] would cost me my job." Id. Simms attached her mid-year performance review to the email she sent to Urbani and asked him to "notice the dates on the review as well as the dates all of this took place." Id. at 2. She received no response from Urbani or anyone else at Trimac. Simms Dep. at 219.

---

[20] Urbani is identified as "O'Banion" in the transcript of Simms's deposition, but his email address and Simms's salutation make it clear that his last name is "Urbani." See Urbani Email at 1.

### J.   <u>Javied's termination</u>

On the same day that Trimac asked Simms for her resignation, Gaines -- at Gallowitz's direction -- also ended Trimac's contract with Javied. Gaines Dep. at 41. Gaines met personally with Javied on September 10, 2007 and gave him a letter terminating his contract. <u>Id.</u> at 42; Lease Termination Letter from Gaines to Javied, Def.'s Ex. 21. ("Lease Termination"). Trimac claimed that Javied violated two provisions in his lease, namely, §§ 2.03 and 5.01. <u>Id.</u>

Section 2.03 provided for immediate termination for "any act or omission by the Independent Contractor . . . which exposes the Carrier [Trimac] to liability for personal injury or property damage . . . or results in a violation of federal, state, local or foreign law or regulation." Lease Agreement at § 2.03. Gaines explained that Javied was in "noncompliance [because] he had provided money to a supervisor in the company" and that the "threatening phone call . . . was a violation of local law." Gaines Dep. at 43-44. The company was interested in citing § 2.03 because it "provide[d] for immediate discharge rather than the 30-day notice." <u>Id.</u> at 44.  The Lease Termination also referenced § 5.01 of the lease, which required Javied to "operate the leased equipment and the Carrier's equipment in a

safe and prudent manner." Lease Agreement at 4. The company knew
that Javied made his last phone call to Simms from his truck,
which was "a violation of safe and prudent operation." Gaines
Dep. at 46.

An entry in Trimac's human resources software regarding
Javied indicates that he is eligible to be rehired, but Pomilla
clarified that the entry in the system was "just a mistake on a
drop-down box" and that Javied is <u>not</u> eligible for rehire.
Pomilla Dep. at 102. Javied also asked for a "termination fact-
finding review," but Pomilla did not know if that review
occurred. <u>Id.</u> at 105.

### K.  <u>Simms's Interest in Other Positions at Trimac</u>

Simms believes that if she "wasn't a woman with
children [she] would have received promotions . . . [and] moved
on in the company." Simms Dep. at 97. At some point before the
events at issue in this case, Simms spoke with Gallowitz about a
branch manager position at Croydon, and she says he asked her "if
[she] was willing to sacrifice [her] family and [her] children
for the job." <u>Id.</u> at 83. She told him that she was not willing to
do that and did not apply for the position. <u>Id.</u> at 83-84. She
never complained to anyone at Trimac about this conversation. <u>Id.</u>

at 85. She also expressed interest in an operations manager position, but that "never developed." Id. at 99. She did, however, receive a pay increase around the time she discussed the operations manager position with Gallowitz. Id. at 100-101. Simms was also interested in a recruiter position in Detroit, but she did not want to relocate her family. Id. at 103. Another time, she spoke with one Kerry Bringle on the phone regarding a "higher position" in Houston, but she did not pursue the job because it required a significant amount of travel. Id. at 103-04.

### L.   The Branch Manager Job in Spartanburg, South Carolina

Shortly before Simms's employment with Trimac ended, she sought a promotion to be the branch manager of a Trimac branch in Spartanburg, South Carolina ("Spartanburg branch"). Simms Dep. at 110-11. See Job Posting, Def.'s Ex. 11. On July 12, 2007, Simms sent her resume and an email cover letter to James Winton, the region manager who oversaw the Spartanburg branch. Simms Dep. at 111; Simms Email to Winton, Def.'s Ex. 12. She discussed the job opening with Gallowitz and Gaines, and "[t]hey were both very excited" and "[a]bsolutely" supported her in seeking that promotion. Simms Dep. at 111. She spoke on the phone with Winton, and went to South Carolina at the end of July that

-28-

summer to interview for the job. Id. at 111-12; Winton Dep. at

28. She interviewed with Winton, toured the Spartanburg branch,

met some employees, and visited the area. Id. at 114-15. Winton

recommended Simms for the job, and Gaines told her she was likely

to be hired for it. Id. at 115-16; Winton Dep. at 30.

At the beginning of August that year, Simms went to

Houston to interview with members of Trimac's senior management

team. Gallowitz believed that she should apply, and was qualified

for the job, and he "help[ed her] to feel confident about it" by

coaching her in preparation for her Houston interviews. Simms

Dep. at 117-18; Gallowitz Dep. at 58. Simms met with a number of

people in Houston, including Marchbank and Linda Poye.[21] Simms

Dep. at 118; Marchbank Dep. at 21. See also Interview List,

Def.'s Ex. 13. Poye told Simms that she "was glad to see that a

woman was applying for the position, that the industry is not

very friendly to women, and [that] it's very difficult for women

to move into manager positions."[22] Simms Dep. at 119. Simms met

---

[21] Poye's name is spelled as "Poi" in the transcript of
Simms's deposition, but it appears that "Poye" is the correct
spelling. Compare Simms Dep. at 118 with the Interview List,
Def.'s Ex. 13.  Poye was Trimac's Manger of Pricing.

[22] As of August, 2007, and through at least December 2,
2008, there were no women employed as branch managers in Trimac's
(continued...)

with Marchbank over lunch and believed that he supported her application for the Spartanburg job. Id. at 121. Marchbank himself said that he had a "very favorable" impression of Simms and recommended that she be promoted. Marchbank Dep. at 21. Indeed, all of the interviewers who completed written interview evaluations recommended that Simms get the promotion. See Interview Evaluation Forms, Def.'s Ex. 14.

On August 31, 2007, the same day that Simms met with Gaines and Gallowitz about the loan and Javied's threatening messages, Winton was drafting a letter offering Simms the Spartanburg branch manager position. Winton Dep. at 30, 35. From emails that Trimac submitted as exhibits, it appears that Winton sent that draft to Pomilla on the morning of August 31, and Urbani also reviewed it by that afternoon. See Email from Barry Urbani, Def.'s Ex. 15. But Marchbank instructed Winton "not to proceed" with the offer. Winton Dep. at 30, 35. The next week Marchbank told Winton that Simms was "no longer a candidate" but did not tell him why. Id. at 30-31. Ultimately, Trimac did not offer Simms the Spartanburg branch manager job "because of the issues in Croydon." Marchbank Dep. at 21.

---

[22] (...continued)
Eastern Division. Marchbank Dep. at 11.

At the time Trimac considered Simms for the Spartanburg job, there was only one other internal candidate, and she, too, was female. Winton Dep. at 27-28. There were also external candidates, but internal candidates were given a preference. Id. at 28. After Simms's resignation, Winton "start[ed] the search process over" to look for someone to fill that position. James Winton Deposition, Ex. 1 to Def.'s Supp. Cert., at 36. On November 12, 2007, Trimac offered the position to a male external candidate, Thomas Jones. Id.; Letter from James Winton to Thomas Jones, Pl.'s Ex. W at 1.

## M.   Other Employees

Simms believes that in terminating her employment Trimac treated her differently from male employees who she believes also violated Trimac's policies. Simms Dep. at 105. For example, another policy in the Employee Handbook prohibits family members from supervising each other, yet a shop manager in Croydon supervised his own son. Simms Dep. at 105; Employee Handbook at § 104. Marchbank contends that this was not a violation because "[i]t's fully disclosed" and existed before the company had a policy against family members supervising each other. Marchbank Dep. at 16. Another father-son team worked at

the Spartanburg branch; the father was an independent contractor driver, and his son was a dispatcher. Winton Dep. at 14-15. Winton said that during his tenure as region manager another dispatcher worked with the father (i.e., the son never dispatched his own father), but Winton did not know what the arrangement was prior to his arrival. Winton Dep. at 15-16, 22. Other than Simms's unfounded contentions, however, there is no evidence that the son in Spartanburg actually dispatched or supervised his father.[23]

### N.   **Effect on Simms**

Simms believes that she can no longer work in the trucking industry because her "reputation is tarnished" and one of her references no longer talks to her or returns her calls. Simms Dep. at 198, 202. She has applied for jobs in the trucking industry and received no response. Id. at 203. She believes that

---

[23] In her deposition, Simms also mentioned a driver who "confessed [to her that] he had consumed a food that contained marijuana" but nonetheless cleared Trimac's drug screening. Simms Dep. at 106-07. The driver spoke to Gaines and Gallowitz about this issue, yet after the drug test came back negative Gaines told Simms to keep the information about the driver's confessed drug use confidential. Id. at 106, 108. Simms does not mention this incident in her brief, and we will not discuss it further because it has no relation to the facts at issue here. The pot-smoking driver was in no way similarly situated to Simms.

people at other trucking companies may have heard about her

situation at Trimac because drivers regularly change companies,

but she has no evidence that this has happened. Id. at 203.

Simms's situation has also been personally difficult. She

"contemplated leaving [her] family," and she did not "know how

[she is] going to start over in a new job . . . trust a new job,

new employers." Id. at 202. She also regularly has headaches and

trouble sleeping, and she lost her self-esteem. Id. at 201.

    Despite these concerns, Simms has found a new job.

Beginning in January of 2008, and continuing at least through the

time of her deposition, Simms has worked at Prudential, and she

plans to remain employed there. Id. at 198-99, 201, 205. She

works forty hours per week and earns $16.00 per hour, and she

collected unemployment benefits between her resignation from

Trimac and beginning this new job. Id. at 198-99, 204. Prudential

offers all of the benefits that Simms had at Trimac. Id. at 200-

201.

## II.  **Analysis**[24]

---

[24] Summary judgment is appropriate if there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In
ruling on a motion for summary judgment, the Court must view the
evidence, and make all reasonable inferences from the evidence,
(continued...)

All of Simms's claims arise under Title VII and are thus governed by the familiar burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Ezold v. Wolf, Block, Schorr and Solis-Cohen</u>, 983 F.2d 509, 522 (3d Cir. 1992). For each of her claims, Simms must first establish a <u>prima facie</u> case of discrimination.  The burden then

---

[24] (...continued)
in the light most favorable to the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  <u>Liberty Lobby</u>, 477 U.S. at 255.

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  <u>Trap Rock Indus., Inc. v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir.1982).  It is not enough to discredit the moving party's evidence, the non-moving party is required to "present <u>affirmative</u> evidence in order to defeat a properly supported motion for summary judgment." <u>Liberty Lobby</u>, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50.  Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

-34-

shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 411 U.S. at 802. Finally, the plaintiff has an opportunity to prove by a preponderance of the evidence that the employer's nondiscriminatory reason is pretextual. Id. at 804; Texas Dep't Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The McDonnell Douglas framework "serves to bring the litigants and the court expeditiously and fairly to [the] ultimate question" of whether Trimac intentionally discriminated against Simms. Burdine, 450 U.S. at 253. In other words, that framework helps courts determine whether unlawfully discriminatory reasons motivated an employer to take an action against an employee.

We will first address Simms's claim for retaliation and then turn to her claim for disparate treatment discrimination. Simms concedes, and on this record we agree, that Trimac has stated a legitimate, nondiscriminatory reason for firing her. Pl.'s Brief at 31. Therefore, we will analyze only the first and third stages of the McDonnell Douglas framework.

## A.   Retaliation

To establish a prima facie case for retaliation, Simms
must show that "(1) she engaged in activity protected by Title
VII; (2) the employer took an adverse employment action against
her; and (3) there was a causal connection between her
participation in the protected activity and the adverse
employment action." Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d
Cir. 1995). Trimac concedes that its request that Simms resign
was an adverse employment action, but it contends that Simms
engaged in no protected activity and that there was no causal
connection between that activity and her termination.

### 1.   Protected Activity

For a prima facie case of retaliation, protected
activity covers a wide range of behavior that extends well beyond
formal petitions and includes informal complaints to management
regarding activity Title VII prohibits. Curay-Cramer v. Ursuline
Academy, 450 F.3d 130, 134 (3d Cir. 2006). General complaints
about unfair treatment that do not allege such discrimination are
not protected activity. Id. (citing Barber v. CSX Dist. Serv., 68
F.3d 694, 701-02 (3d Cir.1995)). But there is no bright-line rule
that separates protected from unprotected activity. Instead, we

-36-

look at the facts and examine "the message being conveyed rather than the means of conveyance." <u>Curay-Cramer</u>, 450 F.3d at 135.

In this case, Simms made her first complaint to Trimac about Javied's treatment on August 30-31, 2007. She spoke with her supervisor, Gaines, and <u>his</u> supervisor, Gallowitz, about sexually explicit and threatening messages that she received from a co-worker, some of which were related to Simms's work at Trimac and her possible promotion. Despite Pomilla's (extraordinary) view that this was not a complaint of sexual harassment, a reasonable fact-finder could conclude that Simms was making such a complaint. In this context, and viewing the facts in the light most favorable to Simms, she has established the first element of her <u>prima facie</u> case for retaliation.

## 2.   <u>Causal Connection</u>

Simms "may rely upon a broad array of evidence" to establish a causal connection between her complaint to Gallowitz and Gaines regarding Javied's messages and her termination less than two weeks later. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 284 (3d Cir. 2000). In her brief opposing Trimac's motion, however, Simms only points to two supposed links: (1) "information which Simms reported in the context of reporting

sexual harassment was used to attempt to justify her termination," and (2) the temporal proximity between her initial report and her termination. Pl.'s Brief at 30.  As to the first alleged link, Simms cites no authority -- and this Court is unaware of any -- for her contention that an employer may not base a termination on information that it happens to receive during an employee's complaint of sexual harassment.[25] Her claim regarding the temporal connection, however, has some merit, and we will discuss that in more detail.

In Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989), our Court of Appeals held that a Title VII retaliation plaintiff established a causal link, for his prima facie case, between his protected activity and his discharge when the employer fired the plaintiff two days after it received his discrimination charge from the Equal Employment Opportunity Commission.  More recently, though, our Court of Appeals qualified the impact of its ruling in Jalil: "temporal proximity

---

[25] Indeed, were this the case, it would lead to absurd results. Suppose an employee went to her boss and, in the course of a single conversation, admitted stealing from the company and complained about a co-worker's harassment. If the hypothetical company was barred from firing the thief because she simultaneously complained of sexual harassment, misbehaving employees could immunize themselves from discharge -- for a time, at least -- through the vaccine of a sexual harassment complaint.

alone will be insufficient to establish the necessary causal
connection when the temporal relationship is not 'unusually
suggestive.'" Farrell, 206 F.3d at 280 (discussing Jalil). See
also Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267
(3d Cir. 2007) ("To establish the requisite causal connection a
plaintiff usually must prove either (1) an unusually suggestive
temporal proximity between the protected activity and the
allegedly retaliatory action, or (2) a pattern of antagonism
coupled with timing to establish a causal link.").

In Farrell, our Court of Appeals admitted that there
appears to be a split in its jurisprudence on this issue but
determined that the "'split' is not an inconsistency in our
analysis but is essentially fact-based. Rather, we have ruled
differently on this issue in our case law, depending, of course,
on how proximate the events actually were, and the context in
which the issue came before us." Farrell, 206 F.3d at 279. In
that case, the Court specifically did not determine whether the
timing alone would suffice to support the plaintiff's prima facie
case. Id. at 278-79, 280. Instead, it examined all of the
evidence in the record and found that Farrell made out a prima
facie case for retaliation. Id. at 279. The Farrell plaintiff's
direct supervisor made sexual advances toward her while on a

-39-

business trip, lied about other executives' complaints regarding the plaintiff's performance, and was directly involved in the company's decision to end her employment.  Id. at 276, 285-86. In addition, the company had inconsistent reasons for terminating Farrell's employment -- first citing an upper management decision to consolidate departments and then mentioning complaints the plaintiff's supervisor (the same person who made sexual advances toward her) received about her.  Id. at 285. Taking into account Farrell's supervisor's sexual advances, his involvement in the termination decision, the timing, and the inconsistencies, the Court held that Farrell had met the causation element of her prima facie case for retaliation.  Id. at 286.

Unlike Farrell, here there is no evidence that any of Simms's supervisors or decisionmakers harassed her, and Trimac -- to its credit -- terminated Javied's contract after it investigated his threats and inappropriate comments toward Simms. Trimac's core reason for terminating Simms -- the compromising loan she accepted from Javied -- is consistent throughout the record. This is not a case in which the defendant company might be protecting the harasser by discrediting the target employee. To the contrary, Trimac took swift and decisive action against Javied and acted to protect Simms's safety.

Nonetheless, just twelve days elapsed between Simms's first complaint about Javied to Gaines and her termination, and we know that Trimac investigated the relationship between Simms and Javied during that brief time.  Although twelve days is longer than the two days that were in Jalil sufficient to establish this prong of the prima facie case, we conclude that the short period between Simms's complaint and her termination is sufficient, though barely so, to establish her prima facie case.

As we mentioned above, Simms concedes that Trimac has offered a legitimate, non-discriminatory reason for terminating her employment, so we will move to the pretext stage of the McDonnell Douglas analysis.

### 3.   **Pretext**

At this phase, Simms's burden of showing pretext merges with her ultimate burden of proving that "the defendant intentionally discriminated against the plaintiff." Burdine, 450 U.S. at 253. See also id. at 256. Simms may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id. at 256. See also Fuentes v. Perskie, 32 F.3d 759, 764 (3d

Cir. 1994). In this context, the evidence that Simms proffers
must meet a heightened "level of specificity" to survive summary
judgment. Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir.
1998).

    In her brief, Simms contends that the record "exposes
numerous inconsistencies and anomalies that support an inference
that Defendant Trimac did not terminate Plaintiff Simms for an
alleged conflict of interest." Pl.'s Brief at 32. But she
identifies only two supposed "inconsistencies and anomalies" to
support her pretext argument: (1) the temporal proximity, and (2)
Trimac's "conclusion that Simms['s] acceptance of a loan from
Javied even violates [the Conflict of Interest Policy] is at best
questionable" or "suspect." Id.[26]

    Simms claims that we should disbelieve Trimac's
legitimate, nondiscriminatory reason for terminating her
employment because the Conflict of Interest Policy "appears to be

_____

    [26] In Simms's extensive recitation of the facts in her
brief, she cites other contradictions -- for example, the lack of
clarity regarding who decided to ask Simms for her resignation
rather than terminate her outright and whether Gaines or
Gallowitz drafted the resignation letter she signed on September
10, 2007. She does not mention these in support of her pretext
claim, but, for the sake of clarity, none of these minor factual
contradictions is sufficient to raise an inference that Trimac is
lying about its reason for firing Simms.

directed" at relationships between employees and outside vendors, and Javied was more like an employee than an independent contractor. Id. But plaintiff admits that "Javied was technically an Independent Contractor Driver." Id. And the policy applies to "employees [who] have any influence on transactions involving purchases, contracts, or leases." Conflict of Interest Policy.

As a traffic supervisor, Simms was responsible for reporting any misbehavior of Javied and other independent contractor drivers to the branch manager. She also assisted Javied with payroll issues and other conflicts with Trimac, and signed his contract herself. Under these circumstances, Trimac's determination that Simms's relationship with Javied was covered by the policy is far from suspect. Simms further contends that she was "rarely in a position to provide anything of value to Javied," there is no evidence that she did so, and she eventually disclosed the loan on August 30, 2007.[27] Pl.'s Brief at 33. But

---

[27] Simms also argues that Trimac generally follows a progressive discipline policy but immediately fired her for her violation, while it allowed men to work for Trimac while they allegedly violated Trimac's policies regarding conflicts of interest and employment of relatives. We will address this argument in full in our discussion of her disparate treatment claim below. Briefly, Simms's situation is quite different from the men she references, and how Trimac treated them does not expose any nefarious possibilities as to how Trimac treated her.

the policy requires disclosure of potential conflicts "as soon as possible," not just when an employee actually takes a kickback. Simms accepted Javied's loan in the fall of 2006 and did not disclose it to Trimac until almost a year later. Again, there is nothing suspicious about Trimac concluding that Simms failed to disclose the loan as soon as possible and thus violated the policy. Furthermore, although Trimac emphasized its intention to use progressive discipline, it also specifically reserved its right to terminate an employee when that was warranted. Trimac did so here, and there is nothing in the record that causes us to question that Trimac took this drastic measure because senior management concluded that Simms's actions were a serious violation.

Once again, then, we are left with the issue of whether timing is enough -- but now we face this question at the pretext stage, rather than the initial <u>prima facie</u> stage. Simms cites no authority for the idea that temporal proximity is enough to show <u>pretext</u>. She relies on <u>Jalil</u> to establish her <u>prima facie</u> case, but in <u>Jalil</u> our Court of Appeals stated that at the <u>pretext</u> stage suspect timing simply "<u>may</u> suggest discriminatory motives" on the part of the employer. 873 F.2d at 709 (emphasis added). In <u>Jalil</u>, the Court concluded that the employer's proffered reason

-44-

was pretextual because, in addition to the suspicious timing, the employer also failed to have a written rule or a clear unwritten rule against the plaintiff's behavior that allegedly led to his termination. Here, Trimac had a written Conflict of Interest Policy, and, as we discussed above, there is no reason to be suspicious of its conclusion that Simms's behavior violated that policy.

With no direct evidence of discrimination, our inquiry at this stage is whether "the employer's proffered explanation is unworthy of credence." The timing issue alone would not allow a reasonable factfinder to conclude that Trimac is lying about its consistent, legitimate, and nondiscriminatory reason for terminating Simms.

On this record, then, we conclude that despite the temporal proximity between her complaint and termination, Simms has not met her burden of showing that a discriminatory reason more likely motivated Trimac or that we should distrust Trimac's legitimate, nondiscriminatory reason for terminating her. We will therefore grant Trimac's motion for summary judgment on Simms's retaliation claim.

B.  **Disparate Treatment**

Trimac has also moved for summary judgment on plaintiff's disparate treatment discrimination claim. To establish a prima facie case for such a claim, a plaintiff usually must show that "(1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of her termination give rise to an inference of discrimination." Red v. Potter, 211 Fed. Appx. 82, 83 (3d Cir. 2006). See also Massarsky v. General Motors Corp., 706 F.2d 111, 118 (3d Cir. 1983) ("a plaintiff alleging a discriminatory layoff need show only that he is a member of the protected class and that he was laid off from a job for which he was qualified while others not in the protected class were treated more favorably").

Although courts often use these factors, they do not constitute a rigid formula. E.E.O.C. v. Metal Service Co., 892 F.2d 341, 347 (3d Cir. 1990). More generally, Simms can establish her prima facie case by offering "sufficient evidence . . . such that the court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were

-46-

based on impermissible reasons." Id. at 348. The burden-shifting
framework, beginning with the prima facie case, offers the
plaintiff an indirect way to prove that the employer acted
because of discriminatory reasons. Causation is thus the central
question of the prima facie inquiry. See Sarullo v. U.S. Postal
Svc., 352 F.3d 789, 798 (3d Cir. 2003).

     Trimac concedes that Simms was a member of a protected
class, that she was qualified for her position as a traffic
supervisor and to be the Spartanburg branch manager, and that
Trimac's request for her resignation was an adverse employment
action. Def.'s Brief at 5. The only remaining issue at this stage
of the inquiry, then, is whether Simms has shown that "similarly
situated persons who are not members of the protected class were
treated more favorably, or that the circumstances of her
termination give rise to an inference of discrimination." Red,
211 Fed. Appx. at 83. In its motion for summary judgment, Trimac
contends that Simms has not done so, and we agree.

     In a Title VII employment discrimination action, "the
central focus of the prima facie case is always whether the
employer is treating some people less favorably than others
because of their race, color, religion, sex, or national origin."
Sarullo, 352 F.3d at 798 (internal quotations omitted). Under the

-47-

McDonnell Douglas framework, "a prima facie case . . . raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999). In other words, the burden-shifting scheme outlined in McDonnell Douglas is intended to locate a causal connection -- which Simms must prove -- between impermissible behavior toward Simms and Trimac's request for her resignation. See Sarullo, 352 F.3d at 798.

Simms argues that four circumstances raise an inference of discrimination in connection with Trimac's decisions to ask for her resignation and not offer her the Spartanburg position: (1) two pairs of allegedly similarly situated male employees violated Trimac's policy against family members supervising each other; (2) "males dominate Trimac's management team"; (3) one of these men asked Simms if she was willing to sacrifice her family and children for her job; and (4) as of August of 2007, Trimac had never employed a female branch manager, and it hired a male for the Spartanburg Branch Manager position. Pl.'s Brief at 34.

Regarding Simms's first argument,

"[i]n order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate

-48-

> treatment in a Title VII case, the plaintiff
> must prove that all of the relevant aspects
> of his employment situation are nearly
> identical to those of the [male] employees
> who [s]he alleges were treated more
> favorably. The similarity between the
> compared employees must exist in all relevant
> aspects of their respective employment
> circumstances."

Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir.

1994) (cited in Red, 211 Fed. Appx. at 84).

Although Simms is unclear in her brief, she appears to

argue that Trimac retained two pairings of fathers and sons who

worked together in a supervisory capacity, allegedly in violation

of § 104 of the Employee Handbook, which prohibits family members

from supervising each other. Simms presents thin evidence of

either of these potential conflicts.  Assuming that they exist,

however, she is not similarly situated to these men. Trimac

determined that Simms violated § 107 of the Employee Handbook,

not § 104.  While some people at Trimac knew about the

relationships between these fathers and sons, none knew of her

loan from Javied for nearly a year because she failed to disclose

it. One of the father-son pairs works in the mechanical shop, not

as a traffic supervisor, and there is no evidence in the record

to support Simms's bald assertion that a dispatcher in

Spartanburg ever dispatched his own father.[28] Rather, Winton

testified that the son had not dispatched his father since Winton

arrived, and he did not know -- and Simms offers no evidence of -

- what happened before then. Simms also had a friendship with

Javied, not a family relationship like the supposed comparators,

and there is no evidence that significant sums of money changed

hands between the fathers and sons.

Simms offers no evidence to show that Trimac's

management was "male dominated,"[29] but we do know from Marchbank

that Trimac had not hired a female branch manager in its Eastern

Division and eventually hired a man for the Spartanburg branch

manager job. None of these facts raises an inference of

discrimination, however, especially in light of the company's

documented plan to promote Simms and the uniform support she had

from Trimac's senior management -- at least until they determined

---

[28] Simms cannot merely assert that a son dispatched his father at the Spartanburg location. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57. Rather, she "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. at 257.

[29] In support of this claim, Simms references Trimac's organization chart, which includes only the names and titles of various employees in the company's Eastern Division. Pl.'s Brief at 4; Pl.'s Ex. E. But we cannot determine the sex of Trimac's managers from the names given.

that she had violated the Conflict of Interest Policy. Indeed, in a rare move for a Title VII defendant, Trimac admits that plaintiff was qualified not only for the job she had but also for the promotion she sought. Furthermore, at the point that Trimac considered Simms for the job, there were only two internal candidates, and the other was also female. Only after Simms resigned did Trimac consider the application of the male it eventually hired for the Spartanburg job.

Gallowitz made the one stray remark about which Simms complains, regarding sacrificing her family and children for her job. But he coached Simms for her interviews in Houston and unqualifiedly supported her promotion. Although Gallowitz participated in the investigation of Simms and recommended that Trimac terminate her, his one remark about sacrificing her family and children was "unrelated to the decision process," and that kind of comment is "rarely given great weight." Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 333 (3d Cir. 1995).

Viewing the facts in the light most favorable to Simms, we conclude that she has failed to establish a prima facie case of disparate treatment discrimination, and we will grant Trimac's motion for summary judgment as to that claim. But even if plaintiff could establish her prima facie case, Trimac has a

-51-

legitimate, non-discriminatory reason for ending her employment, and Simms has failed to demonstrate that it is pretextual.

Because Simms neither established her prima facie case for her disparate treatment discrimination claim nor demonstrated that Trimac's legitimate, nondiscriminatory reason for terminating her employment was pretextual, we will grant Trimac's motion for summary judgment and enter Judgment in favor of Trimac.

BY THE COURT:


__\s\Stewart Dalzell